**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK PICKEL and MELISSA PICKEL, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| vs. | : | |
| | : | No. 5:18-cv-03400 |
| LANCASTER COUNTY CHILDREN AND YOUTH SOCIAL SERVICES, *et al.*, | : : : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
WHICH THERE EXISTS NO GENUINE DISPUTE TO
ACCOMPANY PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiffs Mark and Melissa Pickel submit the following Statement of Material Facts as to which they contend there is no genuine disputed issue.

1. Melissa Pickel ("Ms. Pickel") and Mark Pickel ("Mr. Pickel") have three children together. Ms. Pickel has five children from two previous relationships, and Mr. Pickel has two children from a previous relationship. (Ex. 1, Melissa Pickel Affd., ¶¶ 2, 3; Ex. 2, Melissa Pickel Dep. 9:7-10:13).

2. Ms. Pickel is the grandmother and Mr. Pickel is the step-grandfather of ten children, including Sean-Paul Loraw, Jr. and David Mark Loraw. (Ex. 1, Melissa Pickel Affd. ¶ 4).

3. Ms. Pickel's eldest son, Matthew Gable, is a plant manager at CP Industries. (Ex. 1, Melissa Pickel Affd. ¶ 5). He is married and has five children. (Ex. 2, Melissa Pickel Dep. 51:10-17). Ms. Pickel's eldest daughter, Amber Hoffner, is married and is a stay-at-home mother to two children. (Ex. 1, Melissa Pickel Affd. ¶ 6). Ms. Pickel's son, Gardiner Bink, III,

is a corporate financial consultant, married and has one child. (Ex. 1, Melissa Pickel Affd. ¶ 7). Ms. Pickel's son, Devin Pickel, is a police officer in Lancaster County. (Ex. 1, Melissa Pickel Affd. ¶ 8). Ms. Pickel's daughter, Jazmin Loraw, is married and has two children, Sean-Paul and David Mark Loraw. (Ex. 1, Melissa Pickel Affd. ¶ 9). Mr. and Ms. Pickel's minor children, Danielle, Markella, and Zachary Pickel, are high school students and live with the Pickels in York County. (Ex. 1, Melissa Pickel Affd. ¶ 2; Ex. 2, Melissa Pickel Dep. 23:11-23:12).

4. Ms. Pickel has been a stay-at-home mother for nine years. (Ex. 2, Melissa Pickel Dep. 9:7-10:13).

5. Mr. Pickel is an electrical engineer and is employed with ESAB in Hanover, Pennsylvania. (Ex. 3, Mark Pickel Dep. 7:7-13).

6. Jazmin Loraw has suffered from Conradi-Hunermann syndrome since birth. The physical and mental abnormalities associated with this disease have caused Ms. Loraw immense bone and joint pain her entire life. (Ex. 1, Melissa Pickel Affd. ¶ 10; Ex. 2, Melissa Pickel Dep. 87:14-18).

7. In order to remedy the pain, Ms. Loraw has taken strong pain medication, which led to an addiction, and ultimately a significant drug and alcohol issue. (Ex. 1, Melissa Pickel Affd. ¶ 11).

8. When she became pregnant with Sean-Paul, Ms. Loraw turned to her mother and stepfather for help to raise Sean-Paul after his birth. (Ex. 1, Melissa Pickel Affd. ¶ 12; Ex. 2, Melissa Pickel Dep. 134:8-14, 139:21-22, 143:13-17).

9. In order to alleviate the burden on Ms. Loraw and her husband, Sean Loraw, the Pickels agreed to co-parent Sean-Paul. (Ex. 1, Melissa Pickel Affd. ¶¶ 12-14; Ex. 2, Melissa Pickel Dep. 134:8-14).

10. Sean-Paul Loraw, Jr. was born on December 27, 2015. (Ex. 1, Melissa Pickel Affd. ¶ 13; Ex. 2, Melissa Pickel Dep. 132:18-19).

11. From the time of his birth, Sean-Paul lived with the Pickels for at least 3-4 days every week, and at times for several weeks at a time. (Ex. 1, Melissa Pickel Affd. ¶ 13; Ex. 2, Melissa Pickel Dep. 143:13-17, 245:11-16, 245:23-246:2).

12. When Sean-Paul lived with the Pickels, they cared for Sean-Paul like he was one of their own children and fed, clothed, bathed, and educated him. (Ex. 1, Melissa Pickel Affd. ¶ 14; Ex. 2, Melissa Pickel Dep. 129:7-132:2, 138:22-143:17; 145:8-15; 248:3-5).

13. Sean-Paul shared his bedroom with Mr. and Ms. Pickel's son Zachary, who was six years old. The Pickels' daughters, Markella and Danielle, who were 11 and 10 years old respectively, shared a separate bedroom. (Ex. 1, Melissa Pickel Affd. ¶¶ 15, 16; Ex. 2, Melissa Pickel Dep. 9:7-12; 144:1-9).

14. The Pickels, their minor children and Sean-Paul shared every aspect of their lives together – at Christmas time, they crafted ornaments; at Easter time, they decorated eggs. (Ex. 1, Melissa Pickel Affd. ¶ 17).

15. The arrangement between the Loraws and the Pickels lasted until March 2015, when the Pickels suspected that Ms. Loraw was using drugs again. (Ex. 1, Melissa Pickel Affd. ¶ 18; Ex. 2, Melissa Pickel Dep. 149:14-150:4).

16. The Pickels confronted Ms. Loraw, who became agitated and prohibited her parents from seeing Sean-Paul anymore. (Ex. 1, Melissa Pickel Affd. ¶ 18; Ex. 2, Melissa Pickel Dep. 149:14-150:4).

17. Due to Ms. Loraw's ongoing substance abuse issues, Lancaster County Children and Youth Social Services ("LCCYS") was contacted, who initiated an investigation into Mr. and Ms. Loraw. (Ex. 4, Teeples Dep. 11:2-18, 13:5-11).

18. Shortly thereafter, in May 2015, LCCYS caseworkers came to Ms. Loraw's home and asked that Ms. Loraw find someone within 20 minutes who could take Sean-Paul or they would place him in foster care. (Ex. 2, Melissa Pickel Dep. 151:1-9; 158:19-159:8; Ex. 4, Teeples Dep. 21:18-22:1).

19. Ms. Loraw repeatedly explained to LCCYS that Sean-Paul had lived with the Pickels and that she wanted him to stay with them. (Ex. 1, Melissa Pickel Affd. ¶ 19; Ex. 2, Melissa Pickel Dep. 151:7-8).

20. Because Ms. Loraw was unable to immediately reach the Pickels via telephone, LCCYS caseworkers placed Sean-Paul with his paternal grandmother, Karen Loraw, in an emergency placement. (Ex. 2, Melissa Pickel Dep. 151:7-8, 154:4-9).

21. Pursuant to the conditions of the emergency placement, the Loraws were not to see Sean-Paul without supervision. (Ex. 4, Teeples Dep. 24:18-22, 23:6-11).

22. When the Pickels found out about what had happened, Ms. Pickel repeatedly contacted LCCYS to ask that their grandson be returned to them. (Ex. 1, Melissa Pickel Affd. ¶ 19; Ex. 2, Melissa Pickel Dep. 151:7-8, 156:10-14, 157:12-14, 165:5-166:7, 166:17-10, 168:4-8, 170:22-24, 173:12-13, 174:2-21, 182:7-13; Ex. 4, Teeples Dep. 34:15-35:2).

23. When Ms. Pickel was finally able to speak with LCCYS caseworkers on the phone, after over one month had gone by, she was told to simply "let Sean go" and that he was "in a much better place." (Ex. 1, Melissa Pickel Affd. ¶ 20).

24. LCCYS caseworkers had no prior contact with the Pickels and had never been at their home prior to this phone call. (Ex. 1, Melissa Pickel Affd. ¶ 20; Ex. 4, Teeples Dep. 31:6-13).

25. CYS caseworkers knew that the Pickels were *in loco parentis* with Sean-Paul. (Ex. 1, Melissa Pickel Affd. ¶ 19; Ex. 2, Melissa Pickel Dep. 174:2-21).

26. LCCYS caseworkers refused to share information regarding Sean-Paul with the Pickels, notify them of any upcoming court hearings, or allow them to attend any hearings. (Ex. 1, Melissa Pickel Affd. ¶ 21; Ex. 2, Melissa Pickel Dep. 151:7-8; 175:21-176:4; Ex. 15, Natan Dep. 54:1-14).

27. The Pickels applied to become "kinship care" resources for Sean-Paul, after LCCYS caseworkers directed them to do so. (Ex. 1, Melissa Pickel Affd. ¶ 23; Ex. 2, Melissa Pickel Dep. 174:22-175:16).

28. LCCYS placed Sean-Paul with a foster family in Lancaster County because the Loraws allegedly saw Sean-Paul at Karen Loraw's home without supervision. (Ex. 4, Teeples Dep. 24:18-22, 23:6-11).

29. LCCYS did not inform the Pickels of Sean-Paul's placement with foster parents. (Ex. 1, Melissa Pickel Affd., ¶ 22).

30. Because LCCYS did not recognize the Pickels' status *in loco parentis* with Sean-Paul, they were not allowed to see him. (Ex. 1, Melissa Pickel Affd. ¶ 21; Ex. 2, Melissa Pickel Dep. 174:2-21, 208:1-209:11; Ex. 5, Landis Dep. 37:3-12, 38:22-39:6).

31. LCCYS proceeded to process the Pickels' "kinship care" application by investigating the Pickels' background and conducting a home study. (Ex. 6, Wnek Dep. 40:22-

41:3, 57:10-15, 69:19-24, 72:20-22; Ex. 7, Exhibit 3 to Wnek Dep.; Ex. 8, Exhibit No. 10 to Wnek Dep.; Ex. 9, Doyle Dep. 19:1-3).

32. Three months after the Pickels filed their application for "kinship care," LCCYS denied the application citing the following reasons: (1) Mr. Pickel does not have contact with his minor daughter; (2) the Pickels' minor children have significant needs and require continual care and attention; (3) Mr. Pickel has a history of foreclosure in the past five years; (4) the Pickels have unstable housing; (5) the Pickels have open civil complaints; (6) the Pickels have recent involvement with a child welfare agency; and (7) concern for school absences during the 2015-2016 school year for the Pickels' minor daughters.  (Ex. 10, Exhibit 5 to Wnek Dep.).

33. Despite the fact that all allegations against the Pickels were either false or unfounded, LCCYS simply denied them as resource parents without giving them an opportunity to remedy any concerns.  (Ex. 2, Melissa Pickel Dep. 209:12-16, Ex. 6, Wnek Dep. 51:10-22, 63:24-64:1, 68:15-69:1, 69:6-18, 84:14-22, 87:13-19, 88:8-22, 99:21-100:13; Ex. 11, Exhibit 6 to Wnek Dep.; Ex. 12, Exhibit 7 to Wnek Dep.; Ex. 13, Exhibit 9 to Wnek Dep.; Ex. 9, Doyle Dep. 20:2-21:24, 23:20-22; Ex. 14, Exhibit 1 to Doyle Dep.; Ex. 15, Natan Dep. 57:13-58:12).

34. The Pickels appealed LCCYS' decision denying their "kinship care" application. (Ex. 2, Melissa Pickel Dep. 213:13-17; Ex. 16, Exhibit P-3 to Melissa Pickel Dep.).

35. The Pickels' appeal was dismissed because they failed to submit a response pursuant to the Bureau of Hearings December 8, 2015 ruling.  (Ex. 2, Melissa Pickel Dep. 222:9-16, 236:10-17; Ex. 17, Exhibit P-4 to Melissa Pickel Dep.).

36. The Pickels did not receive notification of the Bureau of Hearings ruling as they were taking care of their daughter, Markella, who was severely injured in a car accident and had

to spend weeks in the hospital.  (Ex. 2, Melissa Pickel Dep. 216:19-217:22, 221:2-4, 222:9-16, 236:10-17).

37. Upon petition by LCCYS, the Loraws' parental rights with regard to Sean-Paul were involuntarily terminated by the Lancaster County Court of Common Pleas in August 2016 without notification to the Loraws.  (Ex. 5, Landis Dep. 25:16-24; Ex. 18, Exhibit 9 to Van Cisco Dep. ("Parental rights for the Loraw case were terminated … we did not notify the parents.  I checked with the paralegals prior to sending the petitions out because [] we are still in the 30 day appeal period.  I was told not to notify the parents.").

38. The Pickels filed for custody of Sean-Paul in the Lancaster County Court of Common Pleas.  (Ex. 19, Exhibit P-5 to Melissa Pickel Dep.; Ex. 2, Melissa Pickel Dep. 255:23-24).

39. The Court granted the Pickels *in loco parentis* standing to pursue physical custody of Sean-Paul, but stayed the custody proceeding pending resolution of the ongoing dependency proceeding.  (Ex. 20, Exhibit P-7 to Melissa Pickel Dep.).

40. Sean-Paul's foster parents filed for Sean-Paul's adoption and the Pickels intervened.  (Ex. 21, Exhibit P-8 to Melissa Pickel Dep.; Ex. 22, Van Cisco Dep. 25:21-26:4).

41. A number of hearings were held between December 2016 and June 2017, during which LCCYS attorneys and private attorneys represented Sean-Paul's foster parents and several LCCYS caseworkers testified on their behalf.  (Ex. 1, at Melissa Pickel Affd. ¶ 28; Ex. 6, Wnek Dep. 106:15-17).

42. Due to the lack of financial resources, Ms. Pickel was forced to represent herself and her husband.  (Ex. 1, Melissa Pickel Affd. ¶ 28).

43. On August 4, 2017, the court dismissed with prejudice the Pickels' petition for adoption, reasoning that Sean-Paul spent the majority of his life with his foster parents and "sever[ing] the beneficial bond he has with the two individuals whom he recognizes as his parents" would be a "devastating blow to" Sean-Paul. (Ex. 23, Exhibit P-10 to Melissa Pickel Dep.).

44. LCCYS was solely responsible for the fact that Sean-Paul had lived with his foster parents for an extended period of time and that he was unable to live with or see his grandmother and step-grandfather. (Ex. 1, Melissa Pickel Affd. ¶ 21; Ex. 2, Melissa Pickel Dep. 174:2-21, 208:1-209:11).

45. While the adoption proceedings with regard to Sean-Paul were ongoing, Ms. Loraw became pregnant with her second child. (Ex. 1, Melissa Pickel Affd. ¶ 29).

46. In January 2017, five months before David was born, LCCYS became aware of Ms. Loraw's pregnancy and already initiated plans to take custody of the child and adopt him out. (Ex. 24, Weaver Dep. 12:16-21, 13:19-14:4, 20:5-17; Ex. 25, Exhibit 1 to Weaver Dep.; Ex. 22, Van Cisco Dep. 42:24-43:22, 48:13-21, 50:6-53:14, 107:19-25 ("We did talk to the Millers when we were aware mom was pregnant … and then also again … after David was born. They declined to be a placement resource for David.")).

47. LCCYS had concerns regarding Ms. Loraw's pregnancy, but refrained from reaching out to the Pickels or referring the Loraws to family support services, or any other agency of the county that would be willing to render aid to them. (Ex. 22, Van Cisco Dep. 69:1-70:6).

48. LCCYS sent an adoption intake intern to the Loraws' home in order to assess them. (Ex. 22, Van Cisco Dep. 42:24-43:22).

8

49.     LCCYS decided to wait until the baby was born and then take action.  (Ex. 22, Van Cisco Dep. 45:21-23, 48:13-21, 49:11-16, 51:3-14, 53:10-14).

50.     On May 7, 2017, David was born at Hershey Medical Center in Dauphin County.  (Ex. 1, Melissa Pickel Affd. ¶ 30).

51.     The Loraws understood that they were unable to care for the child and decided that it would be best if the Pickels adopt David without any delay.  (Ex. 1, Melissa Pickel Affd. ¶ 31; Ex. 2, Melissa Pickel Dep. 278:18-279:23).

52.     On May 15, 2017, the Loraws and the Pickels signed temporary guardianship papers and shortly thereafter the Pickels filed a petition for adoption with the York County Court of Common Pleas.  (Ex. 1, Melissa Pickel Affd. ¶ 31; Ex. 2, Melissa Pickel Dep. 294:19-295:12; Ex. 26, Exhibit P-11 to Melissa Pickel Dep.; Ex. 27, Exhibit 4 to Weaver Dep.).

53.     After approximately one week, David was transferred to Lancaster General Women & Babies Hospital.  (Ex. 2, Melissa Pickel Dep. 296:2-14; Ex. 22, Van Cisco Dep. 65:20-22).

54.     The Pickels, the Loraws, as well as social workers at both Hershey Medical Center and Lancaster General Women & Babies, repeatedly informed LCCYS caseworkers and social workers at both hospitals that the Pickels were David's guardians and pre-adoptive parents, and shared with them relevant documentation as evidence.  (Ex. 2, Melissa Pickel Dep. 297:1-12, 303:22-304:15, 310:10-312:6; Ex. 28, Exhibit P-12 to Melissa Pickel Dep.; Ex. 24, Weaver Dep. 25:8-13; Ex. 29, Exhibit 3 to Weaver Dep.; Ex. 30, Exhibit 5 to Weaver Dep.; Ex. 22, Van Cisco Dep. 27:5-9, 62:13-15, 63:16-64:25, 96:24-97:5, 97:10-14).

55.     Only two days after David was born, LCCYS caseworker Stephanie Van Cisco explained to the Loraws and the Pickels that LCCYS had concerns about the Pickels taking

custody of David, but that they could apply to become "kinship care" resources for David.  (Ex. 2, Melissa Pickel Dep. 304:3-15, 329:22-330.5; Ex. 22, Van Cisco Dep. 57:21-25; Ex. 35, Exhibit 2 to Van Cisco Dep.).

56. LCCYS disregarded the Pickels' standing as guardians and pre-adoptive parents of David.  (Ex. 22, Van Cisco Dep. 27:5-9, 57:21-25, 58:1-9, 62:13-15, 63:16-64:25; Ex. 30, Exhibit 5 to Weaver Dep.).

57. On May 23, 2017, LCCYS filed an emergency petition for custody, without prior notification to the Pickels.  (Ex. 2, Melissa Pickel Dep. 301:19-302:5, 318:15-18, 319:5-17; Ex. 22, Van Cisco Dep. 63:1-11, 94:1-19 ("Q. … your first question: Do we have to notify the maternal grandparents since we have the temporary guardian form from the parents signed now … Do you know if you got an answer to this? A. Yes, I did … the agency was not naming [the Pickels] as a party in the petition for custody"); Ex. 31, Exhibit 6 to Van Cisco Dep.).

58. LCCYS does not notify family members of court proceedings.  (Ex. 15, Natan Dep. 54:1-14).

59. LCCYS' petition for custody of David was materially false in that it failed to include the Pickels' petition for adoption and misrepresented the circumstances of the Pickels' guardianship.  (Ex. 32, Exhibit 7 to Frame Dep.) ("Should I list the grandparents as the legal guardian/custodian on the petition worksheet? Or is that something we want to discuss at PRC? … We do not have any paperwork and until we do and confirm it we should not list them.").

60. LCCYS did not notify the Pickels of the adjudicative hearing on its petition for custody of David or allow them to enter the courtroom.  (Ex. 2, Melissa Pickel Dep. 315:7-13, 316:13-20, 320:4-322:2; Ex. 15, Natan Dep. 54:1-14).

61. Ms. Pickel was allowed to give testimony to a limited set of questions and then leave the courtroom immediately afterwards. (Ex. 1, Melissa Pickel Affd. ¶ 33).

62. The court granted LCCYS' petition and LCCYS caseworkers went to the hospital and took custody of David. (Ex. 1, Melissa Pickel Affd. ¶ 34).

63. Neither the Loraws nor the Pickels were allowed at the hospital on that day due to LCCYS' threats that they would have them arrested if they did show up. (Ex. 1, Melissa Pickel Affd. ¶ 34).

64. The last time that the Pickels saw David was at the hospital where he was born. (Ex. 1, Melissa Pickel Affd. ¶ 36).

65. LCCYS moved to terminate Ms. Loraw's parental rights, which the court granted on February 12, 2018. (Ex 22, Van Cisco Dep. 111:16-24).

66. Almost five and one-half months passed between the Pickels' request for placement of David and LCCYS' denial, on December 19, 2017. (Ex. 37, Exhibit 14 to Wnek Dep.; Ex. 6, Wnek Dep. 92:16-93:4).

67. LCCYS denied the Pickels' request for "kinship care" due to similar reasons it had previously denied their request with regard to Sean-Paul. (Ex. 37, Exhibit 14 to Wnek Dep.; Ex. 6, Wnek Dep. 92:16-93:4).

68. After the long legal battle for Sean-Paul, the Pickels were financially unable to pursue another legal battle to obtain custody of David. (Ex. 1, Melissa Pickel Affd. ¶ 35).

69. After initially voicing interest in raising David, Sean-Paul's adoptive family ultimately decided not to adopt David. (Ex. 22, Van Cisco Dep., 107:21-108:5).

70. The LCCYS caseworkers involved in Sean-Paul's and David's cases did not receive any training on the constitutional rights of families and are not familiar with the

constitutional rights families have with regard to their children.  (Ex. 4, Teeples Dep. 10:17-11:1; Ex. 6, Wnek Dep. 21:22-22:6, 22:22-23:5; Ex. 5, Landis Dep. 17:4-16; Ex. 33, Frame Dep. 17:4-9, 18:1-9; Ex. 15, Natan Dep. 26:17-27:8).

71.     LCCYS serves almost 7000 families per year on average in Lancaster County. (Ex. 15, Natan Dep. 22:3-11).

72.     There is a financial incentive connected with the removal of children from their home and their prompt adoption to approved resource homes.  (Ex. 15, Natan Dep. 65:6-16).

73.     LCCYS caseworkers repeatedly expressed preferential treatment for Sean-Paul's adoptive parents, from whom Ms. Van Cisco received a gift for her assisting them in adopting Sean-Paul, and bias against the Pickels. (Ex. 22, Van Cisco Dep. 104:11-14 ("Q. Do you ever … recall referring to the Millers as awesome? A. Likely, yes.  I enjoyed working with them."), 82:1-3 (Q. "before any investigation was done, you knew the Pickels would be denied? A. I guessed that, yes").  Van Cisco Dep. 101:2-10  ("A. … Mr. and Mrs. Miller… did give me a gift of hand lotion … [t]here was a bag from L.L. Bean … Q. that bag was monogramed, I understand? A. Yes, it has a V on it."); Ex. 34, Exhibit 1 to Van Cisco Dep. ("[the hearing] was a full on shit show," "[Ms. Pickel] is a complete disaster," "that grandma [Ms. Pickel] is just freaking crazy"); Ex. 35, Exhibit 2 to Van Cisco Dep. ("I … plan on meeting with the parents to … request any information on potential kinship resources.  Although I know a few we would deny."); Ex. 3, Mark Pickel Dep. 55:11-18 ("Q. …what happened when Ms. Wnek came to the front door. A. First thing out of her mouth was, boy, this looks like a lot worse than what it was the first time.  Right there in [my] mind, that's a biased opinion because there's no way the amount of time I put into painting this house that it looked drastically worse than the last time.").

74. LCCYS caseworkers did not receive any training or guidance on how to handle matters involving individuals who had *in loco parentis* standing. (Ex. 6, Wnek Dep. 36:1-10; Ex. 5, Landis Dep. 38:22-39:6; Ex. 15, Natan Dep. 27:9-11 ("Q. Is there any training or discussion of people in loco parentis? A. Not that I'm aware of." Natan Dep. 37:4-11 ("Q. And there are no separate regulations … for individuals that are in loco parentis? A. Correct." Natan Dep. 51:4-14 ("Q. … Do people in loco parentis have any role? Is there anything in the concurrent planning involving people in loco parentis? A. Not specifically.").

75. LCCYS employs only one full-time "kinship care" specialist, Krystal Wnek, who evaluates approximately 30 families per month. (Ex. 6, Wnek Dep. 11:21, 29:16-25, 32:8-12).

76. Ms. Wnek, guided by her own discretion, sets arbitrary schedules and criteria to evaluate and complete home studies, which differ from the standards in other counties in Pennsylvania. (Ex. 6, Wnek Dep. 50:8-51:9, 60:20-24, 62:7-63:2, 79:1-23, 84:11-22, 37:22-38:5, 39:3-8, 44:11-17; Ex. 22, Van Cisco Dep. 97:25-98:17; Ex. 36, Exhibit 8 to Van Cisco Dep.) ("In York, who knows, they may get approved, their standards are a little different than ours! … A little lower??? Laugh, laugh." (Ex. 15, Natan Dep. 48:12-25, 54:21-55:1, 56:1-7, 55:9-12 (Q. … how long does the resource unit have to complete the home study? A. There is no definite time frame."; Ex. 3, Mark Pickel Dep. 28:12-14 ("Q. Do you know how long she spent at your house? A. I think a little over an hour."); Ex. 2, Melissa Pickel Dep. 202:20-22 ("Q. Was she there for like over an hour? A. I'd probably think a little less than an hour).

77. LCCYS supervisor Jason Doyle assists in the evaluation process by providing background checks to Ms. Wnek who then accumulates all information in a final report. (Ex. 6, Wnek Dep. 40:2241:3, 69:19-24, 72:20-22; Ex. 7, Exhibit 3 to Wnek Dep.; Ex. 8, Exhibit 10 to Wnek Dep.; Ex. 9, Doyle Dep. 19:1-3).

78. Ms. Wnek submits her final report to the placement review committee – a committee consisting of various LCCYS directors and caseworkers – and presents her report and recommendation to the committee without any supporting documentation.  (Ex. 6, Wnek Dep. 69:19-24, 72:20-22; Ex. 7, Exhibit 3 to Wnek Dep.; Ex. 8, Exhibit 10 to Wnek Dep.).

79. The placement review committee consists of all LCCYS directors. (Ex. 6, Wnek Dep. 23:9-18; Ex. 5, Landis Dep. 40:1-8).

80. The placement review committee votes to approve or deny an application for "kinship care" based on Ms. Wnek's report and recommendation.  (Ex. 6, Wnek Dep. 23:19-21, Ex. 22, Van Cisco Dep. 40:6-8; Ex. 33, Frame Dep. 24:4-11, 25:24-26:10; Ex.15, Natan Dep. 46:10-12).

81. Neither Mr. Doyle nor the members of the placement review committee meet with the families or the children, or verify any of the information submitted by Ms. Wnek.  (Ex. 9, Doyle Dep. 17:4-6).

82. Upon conclusion of the Pickels' home study, Ms. Wnek merely "mailed them a letter explaining why they were disapproved and closed the case."  (Ex. 6, Wnek Dep. 51:10-22).

83. LCCYS does not have a written policy or custom to be followed when a complaint against a staff member is received.  (Ex. 9, Doyle Dep. 16:3-6; Ex. 15, Natan Dep. 49:5-23 ("Q. There is no written policy? A. Not that I can recall.")).

84. Mr. Doyle simply notified Ms. Wnek of the Pickels' complaint against her.  (Ex. 6, Wnek Dep. 52:23-53:14, 71:3-5; Ex. 9, Doyle Dep. 15:6-17).

85. Mr. Doyle did not initiate an investigation with regard to the Pickels' complaint against Ms. Wnek.  (Ex. 6, Wnek Dep. 57:16-21; Ex. 9, Doyle Dep. 15:15-17; Ex. 15, Natan Dep. 25:11-14).

86. Mr. Doyle neglected to inform the Pickels of any findings he or LCCYS made with regard to their complaint against Ms. Wnek.  (Ex. 6, Wnek Dep. 15:18-20).

87. There was a three-month delay in the scheduling of the home visit for the Pickels' application to be considered as "kinship care" resources for David.  (Ex. 2, Melissa Pickel Dep. 336:14-17; Ex. 6, Wnek Dep. 92:16-93:4; Ex. 33, Frame Dep. 37:18-38:2; Ex. 38, Exhibit 9 to Frame Dep.).

88. Ms. Wnek, who had already denied the Pickels' "kinship care" application for Sean-Paul in 2015 and who was aware of the Pickels' complaint of her, was tasked with performing the Pickels' second home study in 2017.  (Ex. 6, Wnek Dep. 57:10-15).

89. In the adoption proceedings for Sean-Paul, the Lancaster Court of Common Pleas dismissed the Pickels' adoption request because, by that time, Sean-Paul spent the majority of his life with his foster parents and "sever[ing] the beneficial bond he has with the two individuals whom he recognizes as his parents" would be a "devastating blow to" Sean-Paul.  (Ex. 23, Exhibit P10 to Melissa Pickel Dep.).

90. It was LCCYS' written policy to collaborate with all stakeholders to develop and prepare a child permanency plan.  (Ex. 39, Exhibit 1 to Natan Dep. ("Upon placement of a child, the [agency] is required to collaborate with all stakeholders and prepare a [child permanency plan] … for each child … The [agency] must involve the parents, child, youth, relatives, kin and other stakeholders in the development of the [child permanency plan].")).

91. The policy of voting on cases at placement review committee meetings is uniformly followed amongst LCCYS caseworkers.  (Ex. 22, Van Cisco Dep. 40:6-8; Ex. 15, Natan Dep. 45:8-46:12) ("… this is a longstanding committee …").

92. Crystal Natan attends all placement review committee meetings and casts her vote even though she is never directly involved with the families herself. (Ex. 15, Natan Dep. 22:12-15 ("Q. … what involvement do you personally have with the average case? A. With the average case, almost no direct contact."); Ex. 15, Natan Dep. 46:10-12).

Dated: December 9, 2019						Respectfully submitted,

							/s/Dennis E. Boyle
							Dennis E. Boyle, Esquire (PA # 49618)
							Blerina Jasari, Esquire (Admitted *Pro Hac Vice*)
							Whiteford, Taylor & Preston L.L.P.
							800 M Street, N.W., Suite 450N
							Washington, DC  20036
							Tel: (202) 659-6800
							Fax: (202) 331-0573
							dboyle@wtplaw.com
							bjasari@wtplaw.com

							*Counsel for Plaintiffs*