<u>**IN THE UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**</u>

MARK and MELISSA PICKEL,

*Plaintiffs*,

    v.

LANCASTER COUNTY CHILDREN AND
YOUTH SOCIAL SERVICES,
JADE LANDIS, NICOLE LAUZUZ,
CRYSTAL NATAN, KRYSTAL WNEK,
JASON DOYLE, STEPHANIE VAN CISCO
and KAYLA TEEPLES,

*Defendants*.

CIVIL ACTION NO.  18-CV-3400

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>
<u>**FILED ON BEHALF OF DEFENDANTS, LANCASTER COUNTY CHILDREN AND**</u>
<u>**YOUTH SOCIAL SERVICES, CRYSTAL NATAN, KRYSTAL WNEK, JASON DOYLE,**</u>
<u>**STEPHANIE VAN CISCO, AND KAYLA TEEPLES**</u>

## I.    __INTRODUCTION__

This is a civil rights action initiated Plaintiffs Mark and Melissa Pickel, the non-custodial maternal grandmother and maternal step-grandfather of minor children S.P.L. and D.M.L., against the Lancaster County Children and Youth Social Services Agency ("LCCYA") and LCCYA employees Crystal Natan ("Natan"), Jason Doyle ("Doyle"), Stephanie Van Cisco ("Van Cisco"), Kayla Teeples ("Teeples"), and Krystal Wnek ("Wnek") (hereinafter referred to collectively as the "County Defendants").  Plaintiffs allege that the County Defendants abridged their fundamental rights to family integrity and association vis-à-vis their grandsons when they (1) took custody of their grandsons without reasonable suspicion of abuse or neglect, (2) placed the child with non-familial foster parents, (3) deprived Plaintiffs of notice and the right to participate in certain hearings during the course of the children's dependency proceedings, and (4) "adopted [the children] out to other families."  *See* Am. Compl. [ECF 41] at ¶¶ 87-89, 93.

The County Defendants now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), on all claims asserted in Plaintiffs' Amended Complaint.  Because Plaintiffs do not have a constitutionally protected right to family integrity or family association vis-à-vis their grandchildren, their substantive due process and procedural due process claims must fail as a matter of law. It follows that, because no constitutional injury has occurred, Plaintiffs' municipal liability claims against the LCCYA itself must also fail.

## II.    __STATEMENT OF MATERIAL FACTS__

### A.  The Parties

S.P.L. and D.M.L. are the minor children of Jazmin Loraw ("Mrs. Loraw") and Sean-Paul David Loraw, Sr. ("Mr. Loraw") (hereinafter referred to collectively as "the Loraws").  *See* Am. Compl. [ECF 41] at ¶¶ 19, 21-23.  S.P.L. and D.M.L. were born on December 27, 2013, and May 7, 2017, respectively.  *See* Statement of Undisputed Material Facts attached herewith ("SOUF"),

at ¶ 2.  Plaintiffs Melissa Pickel and Mark Pickel (referred to herein as "Plaintiffs") are Mrs. Loraw's mother and step-father, and the children's' maternal grandmother and maternal step-grandfather.  *See* Am. Compl. at ¶ 17, 19; SOUF at ¶ 1.  S.P.L. and D.M.L. have no biological tie to Mark Pickel.  *See* SOUF at ¶ 5.  Defendant Lancaster County Children and Youth Social Service Agency ("LCCYA") is a child welfare agency administered by Lancaster County that provides protective services to minor children living within the County. *See id.* at ¶ 6. Defendant Crystal Natan ("Natan") serves as LCCYA's executive director.  *See id.* at ¶ 7.  Teeples, Wnek, Doyle, and Van Cisco are caseworkers and/or supervisors who work within LCCYA.  *See id.* at ¶ 8.

**B**. **LCCYA Investigates Allegations of Neglect of S.P.L.**

On or about May 18, 2015, LCCYA began an investigation of alleged neglect on the part of S.P.L.'s biological mother and father, Mr. and Mrs. Loraw. *See* SOUF at ¶ 9 and exhibits cited therein.  The family was referred to LCCYA for concerns of drug use and homelessness.  *Id.*; *see also* Teeples Dep., Ex. 4, at 11:14-18.  The case was assigned to Teeples, who was then working as a caseworker in LCCYA's intake department.  *Id.* at ¶ 11 and exhibits cited therein. Teeples made contact with both Mr. and Mrs. Loraw, and subjected them to drug screening.  *See* Teeples Dep., Ex. 4, at 13:12-17-8. Both Mr. Loraw and Mrs. Loraw tested positive for controlled substances.  *See id*. Teeples implemented a safety plan that required S.P.L. to have only supervised contact with his biological parents.  *See* Teeples Dep., Ex. 4, at 21:9-14; *see also* Safety Plan Hearing Petition, *In re: S.P.L.*, dated July 30, 2015, Ex. 8; SOUF at ¶ 12.  When Teeples asked the Loraws whom they wished to supervise their contact with their son, they expressed a preference for Karen Loraw, Mr. Loraw's mother and S.P.L.'s paternal grandmother. *See* Teeples Dep., Ex. 4, at 19:25-21:14. Teeples later discovered that Karen Loraw was

violating the safety plan by allowing the Loraws to reside in her home overnight.  *See* SOUF at ¶ 13. Teeples petitioned the Lancaster County Court of Common Pleas' Juvenile Division for custody of S.P.L., and, on August 14, 2015, LCCYA was granted emergency custody of S.P.L. *Id.* at ¶¶ 14-15.  S.P.L. was placed into a foster home with non-familial resource parents as a result of a judicial determination that continued placement in Karen Loraw's home would be contrary to S.P.L.'s welfare.  *See* SOUF at ¶ 16; Order granting LCCYA Petition for Temporary Custody of S.P.L., Ex. 9.

Contrary to Plaintiffs' allegations that they stood *in loco parentis* with S.P.L., there is no evidence that Plaintiffs cared for, lived with, or assumed custody of S.P.L. prior to his placement with LCCYA.  *See* SOUF at ¶¶ 17-19. During the first 16 months of S.P.L.'s life, the Loraws resided with both Karen Loraw and Helen Fry, Jazmin's maternal grandmother. *Id.* at ¶ 18. Although Mrs. Pickel testified at her deposition that she cared for S.P.L. "every weekend" between January 2014 to June 15, 2015, she later contradicted this testimony. *Id.* at ¶ 19.  There is no evidence that either the Loraws abandoned their parental duties, either informally or formally, at any point during this period. *Id.* at ¶ 21.

### C.  Plaintiffs Apply To Be A Kinship Resource For S.P.L.

In or about August of 2015, after S.P.L. had been taken into custody, Plaintiffs advised S.P.L. that they wish to care for and/or adopt S.P.L.  SOUF at ¶ 22.  Plaintiffs were informed that they could apply to be a kinship resource for S.P.L.  *See* Teeples Dep., Ex. 4, at 33:13-35:24; Melissa Pickel Dep. Vol. 1, Ex. 1, at 173:22-176:11. Plaintiffs later applied to be a kinship resource for S.P.L.  *See* Melissa Pickel Dep. Vol. 1, Ex. 1, at 181:9-207:16;  *see also* Deposition Transcript of Defendant Krystal Wnek, Ex. 6, at 40:12-51:22. Wnek, a kinship specialist employed with LCCYA, was assigned Plaintiffs' application and asked to perform an assessment

4

of Plaintiffs' home. *See* Wnek Dep., Ex. 6, at 40:14-18. Wnek performed a study of Plaintiffs'

home on September 08, 2015. *See* SOUF at ¶ 23 and exhibits cited therein. Wnek found the

home to be "in poor condition." *See* Wnek's Preliminary Home Study, dated September 8, 2015,

Ex. 10; *see also* Wnek Dep., Ex. 6, at 44:23-45:5. Although the family was in transition and had

only been living in the residence for three weeks, the home was cluttered and in disarray. *See*

Wnek Dep., Ex. 6, at 44:23-45:5. On November 5, 2015, LCCYA mailed a notice to Plaintiffs

informing them that their application to become a kinship resource for S.P.L. had been

disapproved. *See* SOUF at ¶ 25 and exhibits cited therein. The reasons given for the disapproval

were as follows: (1) Mark Pickel did not have contact with his minor daughter and the rekindling

of that relationship should be the "focus of his efforts"; (2) the needs of Plaintiffs' own children

were significant and required care and attention; (3) Mr. Pickel had a history of foreclosure

within the past five years; (4) Plaintiffs had a history of unstable housing; (5) Plaintiffs had open

civil complaints dating back to 2007; (6) the family had had recent involvement with a child

welfare agency as a client involving their own children; and (7) current school reports had

indicated a concern for absences during the 2015-2016 school year for Plaintiffs' daughters. *See*

SOUF at ¶ 26; Wnek Home Study Report, Ex. 10; Correspondence addressed to Plaintiffs from

Co-Defendants Jade Landis and Nicole Lauzus, dated November 5, 2015, Ex. 11. Plaintiffs'

application had been disapproved by LCCYA's Placement Review Committee ("PRC"), a group

of LCCYA supervisors, administrators and assistant County solicitors that review home studies

performed by the agency Resource Unit. *See* November 5, 2015, Correspondence, Ex. 11; Wnek

Dep., Ex. 6, at 56:8-13; Natan Dep., Ex. 5, at 45:17-49:23.

On November 23, 2015, Plaintiffs appealed the LCCYA's decision on the basis that they

wished to have their grandson placed in their home. *See* SOUF at ¶ 28 and exhibits cited therein.

Plaintiffs did not appeal LCCYA's decision to disapprove Plaintiffs as kinship resource parents. *See id.* at ¶ 29 and exhibits cited therein.  On December 8, 2015, the Commonwealth of Pennsylvania Department of Human Services' Bureau of Hearings and Appeals issued a Rule to Show Cause to Plaintiffs to explain why their appeal should not be dismissed.  *Id.* at ¶ 30 and exhibits cited therein.  According to the Bureau, the Court of Common Pleas has the exclusive authority by statute to place a child in a specific location.  *See* Ex. 13.  The Rule gave Plaintiffs thirty calendar days to offer a legal basis for why their appeal should not be dismissed.  *See* SOUF at ¶ 31 and exhibits cited therein.  Plaintiffs did not respond to the December 8, 2015, Rule, despite having been served with a copy of the Rule by mail at their last known address. *See* SOUF at ¶ 32 and exhibit cited therein. On January 15, 2016, the Bureau dismissed Plaintiffs' appeal for lack of jurisdiction.  *See* SOUF at ¶ 33 and exhibit cited therein.

### D.  Plaintiffs Petition to Adopt S.P.L.

In August of 2016, after approximately twelve months after S.P.L. was removed from their care, the Loraws' parental rights were terminated.  *See* SOUF at ¶ 34.  After the Loraws' parental rights were terminated, S.P.L.'s resource parents, John and Kristal Miller, filed a petition to adopt S.P.L.  *See id.* at ¶ 35 and exhibits cited therein.  Plaintiffs filed a competing petition on November 7, 2016.  *Id.* at ¶ 36 and exhibits cited therein.  The Court heard evidence on the competing petitions over the course of four days.  *See* SOUF ¶ 37 and exhibits cited therein.  On August 4, 2017, the Honorable Jay J. Hoberg of Lancaster County Court of Common Pleas' Orphans Court Division dismissed Plaintiffs' adoption petition.  SOUF at ¶ 38. In the Memorandum Opinion accompanying his order, Judge Hoberg wrote that the Plaintiffs had not had any "meaningful contact" with S.P.L. since birth and that it was in the child's best interests to be adopted by the Millers. *See* Hoberg Memorandum Opinion and Order dismissing

Plaintiffs' Petition to Adopt S.P.L., <u>Ex. 23</u>.  S.P.L. was adopted by the Millers on September 21, 2017. *See* SOUF ¶ 39.

### E.      The Agency Obtains Custody of D.M.L.

In early 2017, LCCYA learned that Mrs. Loraw was pregnant with her second child, D.M.L. SOUF at ¶ 40 and exhibits cited therein.  D.M.L. was born at Hershey Medical Center, in Dauphin County, Pennsylvania, on May 7, 2015. *See id.* at ¶ 41 and exhibits cited therein. Both Mrs. Loraw and D.M.L. tested positive for cocaine at the time of D.M.L.'s birth. *See id.* at ¶ 42 and exhibits cited therein.  D.M.L. was placed in the hospital's neo-natal intensive care ("NICU") for prematurity and drug exposure.  *See id.* at ¶ 43 and exhibits cited therein. Caseworker Van Cisco met with the Loraws on May 9, 2017, to discuss a possible placement for the child. *See id.* at ¶ 44 and exhibits cited therein.   The Loraws told Van Cisco that they wanted the child placed with Plaintiffs.  *See id.* at ¶ 45 and exhibits cited therein.   Van Cisco expressed concern that the Plaintiffs would not be a viable option since they were previously disapproved as a kinship resource for D.M.L.'s older brother. *See* Van Cisco Deposition Transcript, attached hereto as Exhibit 7, at 57:19-58:11.  Van Cisco told the Loraws that she would refer Plaintiffs to a resource unit caseworker for an emergency home study while D.M.L. remained in the NICU. *See id*.  Later that same day, Mrs. Loraw left Van Cisco a voicemail stating that she and Mr. Loraw had signed over their rights to Plaintiffs and that Van Cisco would need to contact York County Children and Youth if she wanted to discuss the matter further.  *See* SOUF ¶ 46 and exhibits cited therein.

On May 12, 2017, Plaintiffs filed a petition to adopt D.M.L. with the York County Court of Common Pleas.  *See* SOUF at ¶ 47 and exhibits cited therein.  On May 15, 2017, while Plaintiffs' adoption petition was pending, D.M.L. was transferred to Women & Babies Hospital

in Lancaster County at his parents' request.  *See id.* at ¶ 48 and exhibits cited therein.  The

Loraws were receiving methadone treatment near Women & Babies, and wanted to be closer to

their son.  *See* Van Cisco Dep., <u>Ex. 7</u>, at 65:19-66:7; Melissa Pickel Dep. Vol. 2, <u>Ex. 2</u>, at 296:6-

19. On May 23, 2017, Van Cisco, acting on behalf of LCCYA, petitioned the Lancaster County

Juvenile Court for custody of D.M.L.  *See* SOUF at ¶ 49 and exhibits cited therein.  The Court

granted the petition on the same day, and placed D.M.L. with foster parents. *See id.* at ¶ 50 and

exhibits cited therein.

On or about May 23, 2017, Van Cisco referred Plaintiffs to LCCYA's resource unit for the

unit to determine Plaintiffs' suitability as emergency caregivers for D.M.L.  *See id.* at ¶ 51 and

exhibits cited therein.   The agency learned that Mrs. Pickel did not have a valid driver's license,

had an outstanding warrant in York County for a meter violation, and had recently been issued a

truancy citation. *See* Preliminary Home Study, dated September 11, 2017, <u>Ex. 48</u>; *see also* Wnek

Dep., <u>Ex. 6</u>, at 64:14-66:13.

On or about May 29, 2017, Plaintiffs sent Van Cisco a copy of their adoption petition via e-

mail.  *See* SOUF at ¶ 52 and exhibits cited therein.  Attached to the same e-mail was an executed

temporary guardianship form that had no legal effect.  *See id.* and exhibits cited therein.  On June

12, 2017, following an adjudication hearing, the Lancaster County Juvenile Court declared

D.M.L. dependent, and ordered that the agency should not attempt to reunify him with the

Loraws, but rather, attempt to find him an adoptive placement. *See id.* at ¶ 54 and exhibits cited

therein. Judge Gorbey directed LCCYA to determine what obligation it had, if any, to intervene

in Plaintiffs' adoption proceedings. *See id.* at ¶ 55 and exhibits cited therein.  In July of 2017,

LCCYA filed a motion to intervene in the adoption proceedings pending in York County. *See*

SOUF at ¶ 56 and exhibits cited therein.

On August 3, 2017, the York County Orphans Court held a hearing to consider Plaintiffs' adoption petition.  *See id.* at ¶ 58 and exhibits cited therein.  The Court dismissed Plaintiffs' petition without prejudice on jurisdictional grounds and directed Plaintiffs to refile the petition in Lancaster County if they wished to pursue custody of D.M.L.  *See id.* at ¶ 59 and exhibits cited therein.  Plaintiffs never refiled their petition to adopt D.M.L. *See* Melissa Pickel Dep. Vol. 2, Ex. 2, at 334:9-17.

### F.  LCCYA Disapproves Plaintiffs As A Kinship Resource For A Second Time

After Plaintiffs' adoption petition was dismissed, LCCYA moved forward with determining whether Plaintiffs were a suitable kinship resource for D.M.L.  *See* SOUF at ¶ 61 and exhibits cited therein.  Wnek was tasked with performing another study of Plaintiffs' household.  *See id.* at ¶ 62.  Wnek scheduled appointments to perform the home study on August 14, 2017, and August 22, 2017, but Mrs. Pickel unilaterally canceled both appointments.  *See* Wnek Dep., Ex. 6, at 58:3-18.  On August 22, 2017, Wnek sent Mrs. Pickel a letter warning her that it was her responsibility to reschedule the appointment by August 30, 2019, or the family's application would be disapproved.  *See id.* at 58:11-18; *see also* Correspondence to Plaintiffs from Wnek, dated August 22, 2019, urging Mrs. Pickel to reschedule her home study appointment, Ex. 36. Wnek finally visited Plaintiffs' home on September 11, 2017.  *See* SOUF at ¶ 63 and exhibits cited therein. She found the home to be in "total disarray," and in worse condition than it had been two years earlier.  *See* Preliminary Home Study, dated September 11, 2017, attached hereto as Exhibit 44. Piles of dishes and food were stacked a foot high on the kitchen counter; and there was trash, food, and other items cluttering the kitchen and living areas of the home.  *See id.*  Mr. Pickel was found holding a bullmastiff dog at bay.  *See id.*   The couple explained they had recently purchased the dog to serve as a service animal for their youngest child, Zackery, and

intended to train the dog themselves. *See id.* LCCYA sent Plaintiffs a disapproval letter on December 19, 2017. *See* SOUF at ¶ 65 and exhibits cited therein.

Plaintiffs appealed the agency's decision to the Bureau of Hearings and Appeals on January 5, 2018. *See* SOUF at ¶ 66 and exhibits cited therein. On April 24, 2018, the BHA mailed the parties a letter advising them that a hearing on the merits was scheduled for June 28, 2018. *See id.* at ¶ 67 and exhibits cited therein. On June 28, 2018, at approximately 8:46 a.m., BHA received a call from Mrs. Pickel who said she would not be attending the hearing. *See id.* at ¶ 68 and exhibits cited therein. At approximately 9:16 a.m., an administrative law judge convened the hearing. *See id.* at ¶ 69 and exhibits cited therein. The ALJ held the hearing in recess for one half hour to allow Plaintiffs time to arrive at court. *See id.* at ¶ 70 and exhibits cited therein. At approximately 9:45 a.m., the ALJ reconvened the hearing; however, Plaintiffs never appeared for the hearing. *See id.* at ¶ 71 and exhibits cited therein. LCCYA moved for a dismissal of the appeal based, *inter alia*, on Plaintiffs' failure to appear for the hearing. *See id.* at ¶ 72 and exhibits cited therein. On July 24, 2019, BHA dismissed Plaintiffs' appeal. *See id.* at ¶ 73 and exhibits cited therein.

The Lancaster County Court of Common Pleas terminated the Loraws' parental rights as to D.M.L. on February 12, 2018. *See id.* at ¶ 74 and exhibits cited therein. D.M.L. was adopted by his resource parents on May 22, 2019. *See id.* at ¶ 75 and exhibits cited therein.

## III.   **RELEVANT PROCEDURAL HISTORY**

This civil action arises from events involving Plaintiffs' unsuccessful attempts to obtain custody of their two grandsons, S.P.L. and D.M.L., after they were deemed dependent by the Juvenile Court of Lancaster County, Pennsylvania. On or about August 13, 2018, Plaintiffs filed their original complaint, which named LCCYA and LCCYA employees Doyle, Wnek, Natan,

and Van Cisco as defendants, among others.[1]  *See generally* Compl. [ECF No. 1].  The complaint asserted substantive due process and procedural due process claims against Doyle, Wnek, Natan, and Van Cisco, and a number of municipal liability claims against LCCYA itself, all under 42 U.S.C. § 1983.  *See id.* at ¶¶ 85-102.  On October 16, 2018, Plaintiffs filed affidavits of service stating that LCCYA, Van Cisco, Doyle, Wnek, and Natan were served with a copy of the complaint and summons on August 22, 2018, by leaving copies with Natan, an agent authorized to accept service on LCCYA's behalf.  *See* relevant Affs. of Service [ECF Nos. 9-13].  The County Defendants filed an answer to Plaintiffs' original complaint on October 22, 2018.  *See* Ans. to Compl. [ECF No. 17].  The answer asserted a number of affirmative defenses, chief among them that (1) the individual defendants are entitled to qualified immunity and (2) Plaintiffs failed to state claims for which relief can be granted under § 1983.  *See id.* at pp. 20-29.

Several months after discovery began, Plaintiffs filed an amended complaint, which asserted identical causes of actions as those asserted in Plaintiffs' original complaint but substituted Teeples as the Doe Defendant. *See* Am. Compl., filed on August 8, 2019, [ECF No. 41].  The County Defendants timely filed an answer to Plaintiffs' amended complaint on August 22, 2019, raising the same affirmative defense they raised in their original answer.  *See* Ans. to Am. Compl. [ECF No. 48].  The County Defendants now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), on all three counts asserted in the Amended Complaint on the grounds that (1) Plaintiffs did not suffer a cognizable constitutional injury, as a matter of law; and (2) the individual County Defendants are entitled to qualified immunity on Counts I and II of the Amended Complaint.

## IV.   **APPLICABLE LEGAL STANDARDS**

---

[1]     The Complaint also named a Doe Defendant, Jade Landis, and Nicole Lauzus as defendants to this action. Lauzus and Landis are not County employees, are represented by separate counsel of record, and do not join in this motion.

### A.      Legal Standards Applicable to Summary Judgment Motions

Summary judgment should be rendered if the materials in the record, including the pleadings, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, [and] interrogatory answers," show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56 (c)(1).  A factual dispute is only "material" if it might affect the outcome of the case, and an issued is only "genuine" if a reasonable fact finder is able to return a verdict in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Put differently, in order to prevail on a motion for summary judgment, the moving party must show "that there is an absence of evidence to support the non-moving party's claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

A party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323. Although the evidence must be viewed in the light most favorable to the non-moving party, the non-moving party may not rely solely upon the pleadings to survive summary judgment.  *Berckeley Inv. Grp. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006).  Rather, once the movant carries its initial burden, the non-moving party "must rebut the motion with facts in the record" essential to their case.  *Id.*; *see also United States v. 107.9 Acre Parcel of Land in Warren Twp.,* 898 F.2d 396 (3d. Cir. 1990).  Although the court "may not weigh the evidence or make credibility determinations" at the summary judgment stage, *Boyle v. Cnty v. Allegheny,* 139 F.3d 386, 393 (3d Cir. 1998), it should not credit an inference predicated upon mere speculation or conjecture. *See Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n.12 (3d Cir. 1990). Where there are no

genuine issues of material fact, the Court may properly resolve any remaining question of law on

summary judgment.  *See, e.g., Ingram v. Cnty. of Bucks,* 144 F.3d 265, 267 (3d Cir. 1998).

### B.  Standards Governing Due Process Claims Asserted Under 42 U.S.C. § 1983

Plaintiffs have asserted substantive and procedural due process claims against the County

Defendants under 42 U.S.C. § 1983 ("Section 1983"). Section 1983 provides, in relevant part:

> Every person who, under the color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory . . . subjects,
> or causes to be subjected, any citizens of the United States or other
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action action at law,
> suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  Section 1983 does not provide substantive rights; rather, Section 1983

provides a vehicle for vindicating violations of rights independently "secured by the Constitution

and laws" of the United States.  *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285, 122 S. Ct. 2286, 153

L. Ed. 2d 309 (2002) (*quoting Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99

S. Ct. 1905, 60 L.Ed.2d 508 (1979));  *see also Gordon v. Lowell,* 95 F. Supp. 2d 264, 268-69

(E.D. Pa. 2000) (quoting *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir. 1996)) (noting that

Section 1983 "provides only remedies for deprivations of rights established elsewhere in the

[U.S.] Constitution or federal laws").  A plaintiff asserting a claim under Section 1983 must

establish both: (1) the deprivation "of a right secured by the United States Constitution [or]"

federal law, and (2) "that the alleged deprivation was committed by a person acting under color

of state law."  *Kneipp*, 95 F.3d at 1204.  Here, there is no dispute that the County Defendants

acted under the color of state law; rather, the dispute is centered on whether they deprived

Plaintiffs of a right secured by the U.S. Constitution or the laws of the United States.

Plaintiffs have alleged that the County Defendants violated their right to due process as

guaranteed by the Fourteenth Amendment to the United States Constitution.  The Fourteenth

13

Amendment to the United States Constitution prohibits states from "depriv[ing] any person of

life, liberty, or property, without due process of law  . . . ." U.S. Const. Amend. XIV, § 1.  The

Due Process Clause has both a procedural component and a substantive one. *See, e.g., Town of*

*Castle Rock v. Gonzales*, 545 U.S. 748, 755-56, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005)

(acknowledging both components). Here, Plaintiffs have asserted both substantive due process

(Count I of the Amended Complaint) and procedural due process (Count II of the Amended

Complaint) claims.

> To establish a substantive due process claim under Section 1983, a plaintiff must

provide (1) the particular interest at issue is protected by the Fourteenth Amendment, and (2) the

government's deprivation of that protected interest shocks the conscience.  *Chainey v. Street*, 523

F.3d 200, 219 (3d Cir. 2008);  *see also Gottlieb v. Laurel Highlands Sch. Dist.,* 272 F.3d 168,

172 (3d Cir. 2001) (stating that substantive due process is violated when state conduct is

arbitrary, or conscience shocking, in a constitutional sense) (quoting *County of Sacramento v.*

*Lewis,* 523 U.S. 833, 847, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).  The threshold issue in

the analysis of any substantive due process claim is whether the plaintiff "has a protected interest

to which the Fourteenth Amendment's due process protection applies."  *Nicholas v. Pa. State*

*Univ.,* 227 F.3d 133, 140-41(3d Cir. 2000) (quoting *Woodwind Estates, Ltd. v. Gretkowski,* 205

F.3d 118 (3d Cir. 2000)).  If the right is fundamental:

> then substantive due process protects the plaintiff from arbitrary or irrational deprivation,
> regardless of the adequacy of procedures used.  If the interest is not fundamental,
> however, the governmental action is entirely outside the ambit of substantive due process
> and will be upheld so long as the state satisfied the requirements of procedural due
> process.

*Nicholas*, 227 F.3d at 142.

> To establish a procedural due process claim, the plaintiff must demonstrate that "(1) [they]

were] deprived of an individual interest that is encompassed within the Fourteenth Amendment's

protection of life, liberty or property, and (2) the procedures available to them did not provide

due process of law." *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 574 F.3d 214, 219 (3d

Cir. 2009).  Unlike substantive due process rights, which are founded upon "deeply rooted

notions of fundamental personal interests derived from the Constitution," *Nunez v. Pachman,*

578 F.3d 228, 233 (3d Cir. 2009) (internal quotation and citation omitted), the liberty rights

protected by procedural due process are somewhat broader and may be created either by state

law or by the federal constitution itself.  *E.B. v. Verniero,* 119 F.3d 1077, 1105 (3d Cir. 1997)

(citing *Sandlin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed 2d 418 (1995)).

Nevertheless, "[t]he procedural component of the Due Process Clause does not protect

everything that might be described as a benefit." *Gonzales,* 545 U.S. at 756.  The Supreme Court

has said that "the most common manner in which a State creates a liberty interest is by

establishing 'substantive predicates' to govern official decision-making, . . . and, further, by

mandating the outcome to be reached upon a finding that the relevant criteria have been met."

*Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 462, 109 S. Ct. 1904, 104 L. Ed 2d

506 (1989) (internal citation omitted).  Thus, a benefit is not a protected entitlement if

government officials may grant or deny it in their discretion.  *Gonzales*, 545 U.S. at 756.

**C.  Standards Governing 42 U.S.C. § 1983 Claims Asserted Against Municipal Entities.**

A municipality is a "person" for purposes of § 1983, and, thus, can be liable under the

statute.  See *Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397,

403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (citing *Monell v. New York City Dep't of Soc.

Servs.*, 436 U.S. 658, 689, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). A municipality cannot be

constitutionally liable under § 1983 on a *respondeat superior* theory, *Monell,* 436 U.S. at 691.  It

is only liable when the plaintiff can establish that the municipality itself, through its formal or

informal adoption or implementation of a policy, regulation or decision actually caused the alleged constitutional transgression.  *Id.*

As the Third Circuit Court of Appeals recently reiterated, "a § 1983 claim against a municipality may proceed in two ways." *Forrest v. Parry,* 930 F.3d 93, 105 (3d Cir. 2019) (citing *Estate of Roman v. City of Newark,* 914 F.3d 789, 798-99 (3d Cir. 2019)).  As the *Forrest* court elucidated:

> A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, [. . .] , or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice," [. . . .] The latter avenue arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its [employees]. [ . . .]

930 F.3d at 105 (internal quotations and citations omitted).

A plaintiff "presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject."  *Id.*  If alleging a custom, the plaintiff "must evince a given course of conduct so well-settled and permanent as to virtually constitute law."  *Id.* at 105-06 (citing *Estate of Roman,* 914 F.3d at 798).  In addition, at the summary judgment stage, the plaintiff must produce some evidence that the custom or policy was the "moving force" behind plaintiff's constitutional injury.  *Id.*

A plaintiff alleging a failure-to-supervise, train, or discipline claim must demonstrate that the specific failure or inadequacy that led to his or her constitutional injury amounted to deliberate indifference on the part of the municipality.  *Forrest*, 930 F.3d at 106.  In order a municipality's failure or inadequacy to amount to deliberate indifference, it must be shown that:

(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.

*Carter v. City of Phila.,* 181 F.3d 339, 357 (3d Cir. 1999) (citing *Walker v. New York,* 974 F.2d 293, 297-98 (2d Cir. 1992)).

Regardless of the avenue a plaintiff chooses to pursue, he or she cannot avert summary judgment with speculation or by resting on the allegations in the pleadings, but rather he or she must present competent evidence from which a jury could reasonably find in their favor. *Ridgewood Board of Education v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999); *Woods v. Bentsen*, 889 F. Supp. 179, 184 (E.D. Pa. 1995).

### D. Legal Standards Applicable to Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Government officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *See Walter v. Pike County, PA*, 544 F.3d 182, 191 (3d Cir. 2008). This rule "recognizes that officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer*, 468 U.S. 183, 195 (1984). Generally, courts perform a two-step analysis to determine whether qualified immunity is appropriate. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536

U.S. 730, 736 (2002). If a plaintiff adequately alleges a constitutional violation, a court must then determine whether the constitutional right at issue was clearly established at the time of the alleged infringement. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).[2]  Even where the right was clearly established, a government officer is entitled to qualified immunity if he reasonably (but mistakenly) believed that his actions did not violate the plaintiff's rights.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude" that probable cause exists and those officials "should not be held personally liable").

V.     **ARGUMENT**

A.   **Plaintiffs Cannot Establish A Substantive Due Process Claim Against The County Defendants.**

In Count I of the Complaint, Plaintiffs allege that the County Defendants have violated their constitutionally protected rights familial association and integrity when they took custody of S.P.L. and D.M.L., and "adopted them out" to other families.  *See* Am. Compl. at ¶¶ 87, 89. The County Defendants are entitled to judgment in their favor as a matter of law on Count I of the Amended Complaint because (1) Plaintiffs do not have a constitutionally protected liberty interest in family integrity or association vis-à-vis their grandsons and/or step-grandsons and (2) even if the Plaintiffs had a constitutionally protected interests, the County Defendants are nevertheless entitled to qualified immunity because Plaintiffs' rights were not clearly established at the time of the constitutional transgressions alleged in their Amended Complaint.

1. **Plaintiffs Do Not Have A Cognizable Liberty Interest in Family Integrity or Associating with S.P.L. and D.M.L.**

---

[2]     The two-step procedure described in *Saucier* is "often appropriate," but not mandatory.  *See Pearson v. Callahan,* 129 S. Ct. 808, 818 (2009) (retreating from *Saucier*).  Rather, as the Supreme Court explained in *Pearson*, the court considering a motion based on qualified immunity may, in appropriate circumstances, consider whether a right was clearly established before considering whether the plaintiff has adequately alleged the violation of a constitutional right.  *See Pearson,* 129 S. Ct. at 818-20.

Count I of the Amended Complaint cannot survive summary judgment because Plaintiffs, noncustodial grandparents who did not stand *in loco parentis* with S.P.L. or D.M.L., do not have a constitutionally protected interest in family integrity or association with their grandsons as a matter of law.   Where, as here, liberty interests are asserted as a basis for § 1983 liability, the court must initially address the "threshold issue" of "whether the plaintiff has alleged the deprivation of an actual constitutional right at all."  *McCurdy v. Dodd,* 352 F.3d 820, 825-26 (3d Cir. 2003) (internal quotations and ending citations omitted).  While the liberty interests of parents in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court,"  *Troxel v. Granville,*  530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the liberty interests of noncustodial grandparents relative to their grandchildren are less defined.  The Third Circuit Court of Appeals has not defined the substantive due process rights of grandparents and other extended family members relative to custodial matters.  *Rees v. Office of Children & Youth*, 744 F. Supp. 2d 434, 445 (W.D. Pa. 2010) ["*Rees I*"], *affirmed*, *Rees v. Office of Children & Youth,* 2012 U.S. App. LEXIS 6447 (3d Cir. 2012) ["*Rees II*"].  However, at least four courts in this Circuit have held that noncustodial grandparents who held little more than biological ties to their grandchildren do not have a fundamental liberty interest in associating with their grandchildren.  *See Rees I*, 744 F. Supp. 2d at 451-452 (dismissing § 1983 claims filed by a grandmother on the basis that she did not have a fundamental liberty interest in maintaining contact with her grandchildren, who were never in her custody); *Clayton v. Children's Choice,* Civ. A. No. 09-5727, 2010 U.S. Dist. LEXIS 85259, 2010 WL 3282979, at *13 (E.D. Pa. 2010) (concluding that "[u]nlike parents vis-à-vis their child, grandparents have no protected liberty interest in the care, custody and management of their children") (citation omitted);  *Bresko v. Critchley,* 2012 U.S. Dist. LEXIS

104889, 2012 WL 3066640, (D.N.J. July 26, 2012) (granting summary judgment in defendant's favor on § 1983 substantive due process claims asserted by a non-custodial, non-cohabitating, non-in-loco-parentis grandmother and a non-custodial, non-cohabitating, non-in-loco-parentis aunt); *see also Derr v. Northumberland Cnty.,* 2019 U.S. Dist. LEXIS 184148 (M.D. Pa. Oct. 23, 2019) (concluding that plaintiff-grandparents did not have a cognizable liberty interest in the care and management of their grandchildren despite having "resided with their grandchildren for at least a short period of time before Northumberland County CYS became involved").  The County Defendants urge the Court to follow the reasoning of these cases and conclude that Plaintiffs do not have a cognizable liberty interest in family integrity and association with their grandsons and step-grandsons.

As the district court acknowledged in its opinion in *Rees I*, courts in sister Circuits have adopted fact-specific, multifactor analyses when addressing the purported due process rights of grandparents and other extended family members.  The factors used in these analyses include: *to wit,* whether the plaintiff is a custodial figure or is otherwise acting in loco parentis to the children; whether and for how long the children were residing with the plaintiff at the time of the alleged deprivation; whether the plaintiff has a biological link to the children; and whether there is a potential conflict between the rights of the plaintiff and the rights or interests of the children's natural parents. *See Rees,* 744 F. Supp. 2d at 445.  Even if the Court adopts this approach, and apply the aforementioned factors to the circumstances of this case, the Court will reach the same unavoidable conclusion: Plaintiffs do not have substantive due process rights to family integrity or association as noncustodial grandparents of S.P.L. and D.M.L.  As an initial matter, Plaintiff Mark Pickel is the *step*-grandfather of both S.P.L. and D.M.L., and does not have any biological ties to either child or their mother.  Although the analysis with respect to

Mrs. Pickel is, admittedly, murkier, the record mandates the conclusion that Mrs. Pickel has no cognizable constitutional interest in the custody of or association with S.P.L. and D.M.L. Although Mrs. Pickel is the biological maternal grandmother of both children, there is no evidence in the record from which the Court could conclude that she stood *in loco parentis* to either child.  D.M.L. never resided with the Pickels, and, although, Mrs. Pickel has testified that she took care of S.P.L. on the weekends, this alone does not afford her *in loco parentis* status over S.P.L.  There is nothing in the record that suggests that Mrs. Pickel was principally responsible for S.P.L.'s care and upbringing at any point in his life.  In fact, at the time that the Agency took custody, S.P.L. was living with his biological parents and had little to no contact with the Pickels.  There is also evidence that Jazmin explicitly informed Teeples that she did not want her mother to be considered as a kinship resource for S.P.L. On this record, the Court cannot, and should not, conclude that Mrs. Pickel stood *in loco parentis* to either S.P.L. or D.M.L.   The balance of these factors, when applied to the circumstances presented in this case, weigh against recognition of a fundamental liberty interest.

Support for this conclusion can be found in the District Court's decision in *Gordon v. Lowell,* 95 F. Supp. 2d 264 (E.D. Pa. 2000).  In that case, the plaintiffs were the biological grandmother and non-biological grandfather of a 7-year-old girl who was declared a dependent of the court following her mother's arrest.  Having been declared a dependent, the child came under the legal custody of Berks County Children and Youth Services and was initially placed by that agency with the plaintiffs, who had previously cared for her for a period of six months when she was 2 years old.  After the plaintiffs voluntarily relinquished custody of the child back to CYS, she was placed in foster care but the plaintiffs maintained visitation.  Eventually, the child was adopted by her foster parents with the recommendation of a court-appointed therapist. Although the

plaintiffs never tried to adopt the girl, they later filed suit against Berks County, CYS, and certain of its employees, claiming that the agency had actively discouraged the plaintiffs' relationship with the child and, in the process, violated their due process rights (among others).

On review of the defendants' Rule 56 motion, the U.S. District Court for the Eastern District of Pennsylvania granted summary judgment in favor of the defendants, ruling, in relevant part, that the plaintiffs lacked any constitutionally protected liberty interest in the care, custody, and management of their grandchildren. 95 F. Supp. 2d at 269-70. The court acknowledged the "long-recognized fundamental liberty interest" which parents have in the care, custody and management of their children as protected by substantive due process principles, *id.* at 269, but it ruled that this protection is limited to parents. *See id.* at 269 ("Grandparents have no similar liberty interest under the Fourteenth Amendment, and are, therefore, accorded no constitutional protection.") (citing *Mullins v. State of Oregon*, supra, at 797).

Here, Mrs. Pickel had even less involvement in S.P.L.'s upbringing than the plaintiffs in *Gordon*. She did not have physical or legal custody of S.P.L. prior to the LCCYA's involvement with the Loraw family, and the contradictions in her testimony suggest that she is exaggerating her role in both children's lives. While Plaintiffs believe they have assumed an important role in both S.P.L. and D.M.L.'s lives, this does not change their legal standing in relation to their minor grandchildren. Plaintiffs simply are not possessed of the constitutional rights they assert. Since neither Plaintiff possesses a liberty interest in family integrity or association as a matter of law, the County Defendants are entitled to summary judgment in their favor on Count I of the Amended Complaint.

**2. Even assuming *arguendo* Count I of the Amended Complaint Implicates a Constitutionally Protected Liberty Interest, Defendants Natan, Van Cisco, Doyle, Wnek and Teeples are Entitled to Qualified Immunity From Liability For Damages in Their Individual Capacities.**

Even assuming *arguendo* that Plaintiffs have a substantive due process right relative to their associational interest with their grandsons, such interest was not clearly established at the time of the alleged constitutional transgressions, and, as such, the individual County Defendants are entitled to qualified immunity to the extent they are being sued in their individual capacities. In *Rees v. Office of Children & Youth,* 473 F. App'x 139, 143 (3d Cir. Mar. 30, 2012), the Court was confronted with the question of whether employees of the Erie County Office of Children and Youth ("OCY") were immune from substantive due process claims asserted by a non-custodial grandmother in relation to her two minor grandchildren.  In affirming the decision of the district court to grant the individual OCY employees qualified immunity, the court noted:

> When assessing whether a right is clearly established, the inquiry requires determining "whether it would be clear to a reasonably officer that his conduct was unlawful in the situation he confronted." [. . .] Our analysis "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'"  [ . . . ].  Immunity should be granted if "the law did not put the officer on notice that his conduct would be clearly unlawful." [ . . . ].  There is **no controlling law on point** in the Third Circuit concerning grandparents' substantive due process rights relative to the custody and care of their non-resident grandchildren.

*Rees II,* 473 F. App'x at 142 (emphasis added) (internal citations omitted).  The County Defendants have been unable to find any precedent that suggest that the state of the law in the Third Circuit concerning the due process rights of grandparents in the custodial context has changed since the *Rees* decision was handed down.  Careful consideration of the existing legal precedent on the subject must lead the Court to the unavoidable conclusion that the existence and/or extent of due process protections for grandparents in the custodial context was distinctly unsettled at the time that the Agency petition the Lancaster County Juvenile Court for custody of S.P.L. and D.M.L.  For these reasons, the Court must afford individual Defendants Natan, Van Cisco, Wnek, Doyle, and Teeples qualified immunity on Counts I and II of the Amended Complaint.

**B.  Plaintiffs Cannot Sustain A Federal Procedural Due Process Claim.**

In Count II of their Complaint, Plaintiffs assert a procedural due process claim that implicates the same liberty interest – the right of a non-custodial, non-in-loco-parentis grandparent to the right to family integrity and family association relative to their grandchildren. Plaintiffs allege that "both the Fourteenth Amendment" to the United States Constitution and "the laws of the Commonwealth of Pennsylvania" guarantee individuals whose children have been taken into protective custody notice of a hearing and the right to the hearing itself.  Am. Compl. at ¶ 92.  Plaintiffs allege that the County Defendants deprived them of their fundamental liberty interests by "not effectively informing the Pickels of their procedural rights and protections" and depriving them of "notice" and "access to hearings" in the underlying dependency proceedings.  *Id.* at ¶ 93.

When analyzing Plaintiffs' procedural due process claim, the Court must first determine whether the nature of the interest that forms the basis of the claim is encompassed within the *Fourteenth Amendment's* protection.  *Pressley v. Blaine*, 352 F. App'x 701, 705, 2009 WL 3842753 at *3 (3d Cir. 2009) (citing *Fuentes v. Shevin*, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed 2d 556 (1972)) (emphasis in original). Only once it is determined that the interest is protected does the Court evaluate what process is due to protect it.  *Id.*  (citing *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972));  *see also Solomon v. Phila. Hous. Auth.*, 142 F. App'x 447, 452, 2005 WL 1805616 at *4 (3d Cir. 2005) (explaining the "bifurcated" procedural due process inquiry: "We first must determine whether the asserted interest is encompassed within the Fourteenth Amendment's protection of life, liberty or property; if so, we then ask whether the procedures available provided the plaintiff with adequate due process.") (citing *Alvin*, 337 F.3d at 116).

Here, the asserted liberty interest is the right to family integrity. Plaintiffs complain that they were not afforded "notice of a hearing and the right to a hearing itself" at the outset of each child's dependency case. *See* Am. Compl. ¶ 92. These allegations, however, do not establish the deprivation of any constitutionally protected liberty interest. For the reasons previously explained in Section V.A.1. *supra*, Plaintiffs have failed to assert a liberty interest sufficient to implicate the requirements of procedural due process.

Moreover, while Pennsylvania law does afford grandparents certain rights vis-à-vis their grandchildren, these rights do not support the type of constitutionally protected liberty interest being asserted here. For example, Pennsylvania law confers upon grandparents standing to petition for physical and legal custody of their grandsons in light of the court's dependency ruling. *See* 23 Pa. Cons. Stat. Ann. § 5324 (3) (providing the circumstances in which a grandparent who is not *in loco parentis* with his or her grandchildren may petition a court for physical or legal custody of the child). In addition, the Pennsylvania Supreme Court has recognized the right of noncustodial grandparents to intervene in an adoption proceeding in order to assert their own custodial interest in their grandchildren, notwithstanding the termination of the natural parents' rights in the children and despite the objections of a social services agency. *See in re Adoption of Hess*, 530 Pa. 218, 608 A.2d 10, 12 (Pa. 1992).

These "rights," however, do not amount to a constitutionally protected interest in family integrity, nor do they guarantee any particular outcome relative to the grandparent's custody, visitation, or adoption request. In this case, like any other dependency case, the state trial court had the authority to grant or deny Plaintiffs' requests as the best interests of their grandsons dictates. *See* 23 Pa. Cons. Stat. § 5328(a) (conditioning an award of any form of custody on a determination of what is "in the best interest of the child"); *id.* § 5328 (c)(2)(ii) (allowing a court

to award partial physical custody to grandparents with standing under § 5325(3) upon a court

finding that the award "would be in the best interest of the child" and would not "interfere with

the parent-child relationship"); *In re Adoption of Hess,* 608 A.2d at 13 (noting "it is clear from

[Pennsylvania's Adoption] Act that the court's concern [in adoption proceedings] is not the will

of the agency but the best interests of the child").   Thus, the rights which Pennsylvania law

affords grandparents to petition for custody or visitation do not create the type of entitlement

which gives rise to a protected liberty interest for federal due process purposes.  *See Faust v.

Messinger*, 345 Pa. Super. 155, 497 A.2d 1351, 1353 (Pa. Super. 1985) (plaintiff's entitlement

merely to *seek visitation* with her grandchild pursuant to the Custody and Grandparent Visitation

Act "does not amount to one which must be protected by the *due process clause*.").

　　　Even if the foregoing state law provisions did create rights entitled to protection under the

federal *due process clause*, Plaintiffs have not alleged an actionable deprivation of those rights.

Plaintiffs were never a party to the dependency proceedings, and, thus, the LCCYA was under no

obligation under Pennsylvania law to notify Plaintiffs of dependency and/or permanency

proceedings.  *See, e.g., in re J.P.,* 832 A.2d 492 (Pa. Super. Ct. 2003) (standing in a juvenile

proceeding is conferred upon a person if the "person cares for or controls the child or is accused

of abusing the child").   Assuming, without conceding, that Plaintiffs were a party to the

dependency and/or permanency proceedings involving their grandsons, the onus was on the

Juvenile Court, not the LCCYA, to give Plaintiffs written notice and a right to participate in the

proceedings.  *See* Pa.R.J.C.P. 1128 (providing that all *parties* shall be present at any proceeding);

Pa.R.J.C.P. 1241 (providing that only the guardian of the child, the attorney for the child, the

attorney for the guardian, the attorney for the county agency, and the county agency should

receive notice of a shelter care hearing); Pa.R.J.C.P. 1501 (providing that the *court* shall give

notice of dispositional hearings to "all parties," including the "parents, child's foster parent, preadoptive parent, or relative *providing care* for the child," but not non-custodial grandparents or relatives).  The record conclusively establishes that Plaintiffs never filed a motion to intervene in the underlying dependency proceedings.  Therefore, under Pennsylvania law, they were not parties to the underlying dependency proceedings, and were not owed written notice or a right to be heard at any hearing associated with their grandsons' dependency cases.

Moreover, Plaintiffs pursued not one, but two appeals, of the LCCYA's decision to disapprove their kinship application.  The first appeal was dismissed for lack of jurisdiction; the second was deemed abandoned when Plaintiffs failed to appear for a hearing on the merits.  *See* SOUF at ¶¶ 33, 73, and exhibits cited therein.  When Plaintiffs became disillusioned with both the kinship referral process, they filed petitions to adopt S.P.L. and D.M.L. *See* SOUF at ¶¶ 36, 47.  Both petitions were afforded full and fair consideration.  Under these circumstances, Plaintiffs cannot establish that the County Defendants deprived them of procedural safeguards they were owed, and any contention to the contrary is belied by the existing record.  For these reasons, the Court can, and should, enter judgment in the County Defendants' favor on Count II of the Amended Complaint.

### C.  Plaintiffs Cannot Sustain Their Municipal Liability Claims Against the LCCYA.

In Count III of the Amended Complaint, Plaintiffs allege a number of municipal liability claims against the LCCYA pursuant to 42 U.S.C. § 1983.[3]  These claims are predicated upon the

---

[3]        LCCYA, as a county-operated social services agency, is treated as municipalities for purposes of *Monell. See Hatfield v. Berube,* 714 F. App'x 99, 102 n.1 (3d Cir. 2017) (citing *Mullholland v. Gov't Cnty of Berks, Pa.,* 706 F.3d 227, 237 (3d Cir. 2013)) (Pennsylvania county offices of children and youth services are treated as municipalities for the purposes of § 1983 municipal liability).  Thus, the principles annunciated by the U.S. Supreme Court in *Monell* apply to the Plaintiffs' claims against LCCYA under § 1983 as if they had sued the County itself. *See Mullholland,* 706 F.3d at 237. ("When a suit against a municipality is based on §1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.") (citations omitted).

same constitutional violations that underlie Counts I and II of the Amended Complaint.  *See* Am. Compl. at ¶ 103.  Fundamentally, Plaintiffs' claims against the LCCYA fail as a matter of law because, given the facts contained in the complaint, no predicate constitutional violation has been alleged.  *See Bittner v. Snyder Cnty., PA,* 345 F. App'x 790, 792-93 (3d Cir. 2009) ("It is well settled that before a municipality may be found liable under § 1983, there must be a constitutional violation); *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (holding that "in order for municipal liability to exist, there must still be a violation of the plaintiff's constitutional rights") (citation omitted); *Marable v. West Pottsgrove Twp.,* 176 F. App'x 275, 283 (3d Cir. 2006) ("[A] municipality may not incur *Monell* liability as a result of the actions of its officers when its officers have inflicted no constitutional injury"); *see also Craddock v. Darby Borough*, Civ. A. No. 12-4519, 2015 U.S. Dist. LEXIS 53286, 2015 WL 1854685, at *23 (E.D. Pa. Apr. 22, 2015) (granting summary judgment in favor of the borough on Plaintiff's *Monell* claim on the basis that the record did not establish a predicate constitutional violation).

Moreover, even assuming the existence of an underlying constitutional tort, the record does not support theories of municipal liability against the County. Here, Plaintiffs allege in a boilerplate fashion that LCCYA "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of families in Lancaster County," Am. Compl. at ¶ 97, including: (1) a policy and/or custom of "ignor[ing] the rights of those *in loco parentis* with children when taking children and placing them in foster care," *id.* at ¶ 99; (2) "fail[ing] to exercise reasonable care in investigating 'kinship care' applications by families, including the Pickels, thereby failing to adequately prevent constitutional violations on the part of its caseworkers," *id.* at ¶ 100; and (3) "inadequately supervis[ing] and train[ing] its caseworkers, including [Defendants Natan, Wnek, Doyle, Van Cisco, and Teeples] . . . ," *id.* at ¶ 101. These

claims can be divided into two categories: (1) the failure to properly train LCCYA caseworkers; and (2) a custom/policy of failing to search for and identify potential kinship providers.

Plaintiffs have not adequately pled, let alone created a genuine issue of material fact that could support, a § 1983 failure-to-train claim against LCCYA.  While liability may exist on a *Monell* claim based on a municipal defendant's failure to properly train employees to avoid violating constitutional rights, *see Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011), to find such liability, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 563 U.S. at 61 (*quoting City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)); *Thomas*, 749 F.3d at 222-23.  A plaintiff must establish deliberate indifference with proof that the defendant ignored a known or obvious result, and therefore that the defendant had "notice that a course of training is deficient in a particular respect." *Connick*, 563 U.S. at 62; *Wright v. City of Phila*., 685 F. App'x 142, 147 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 360, 199 L. Ed. 2d 264, 2017 WL 3507552 (Oct. 16, 2017); *Thomas*, 749 F.3d at 223. The alleged training deficiencies must also be so "closely related" to the injury ultimately inflicted upon the plaintiff as to have been an actual cause of the harm. *City of Canton*, 489 U.S. at 391; *Thomas*, 749 F.3d at 222. The Amended Complaint neither "identifie[s] a specific deficiency in [LCCYA's] training program" or alleges that the deficiencies in LCCYA's training program "actually caused [the constitutional violation]" *i.e.*, the violation of Plaintiffs' fundamental right to family integrity or association.  *City of Canton*, 489 U.S. at 381.  The conclusory allegations found in Paragraph 103 of the Amended Complaint cannot even survive a motion to dismiss, let alone summary judgment.  *See Woloszyn v. Cnty of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (affirming grant of summary judgment in

defendant's favor where plaintiff did not identify specific training for purposes of failure-to-train claim); *see also Morgan v. Covington Twp.,* No. 3:07-cv-1972, 2009 U.S. Dist. LEXIS 56003, 2009 WL 585480, at *37-*38 (M.D. Pa. Mar. 6, 2009) (To meet his or her burden in the context of a § 1983 failure-to-train claim, "[A] plaintiff must identify specific training the municipality has failed to provide that directly caused his injury and must demonstrate that this failure reflects deliberate indifference").  The record does not contain any evidence that the lack of adequate training was the "moving force" behind Plaintiffs' alleged injuries (assuming they suffered a constitutional injury at all).  Nor have Plaintiffs identified the training LCCYA *should* have provided their caseworker that might have prevented the accident.  Plaintiffs fall far short of meeting the "deliberate indifference" standard required to establish an § 1983 failure-to-train claim, and, consequently, the County Defendants are entitled to summary judgment on this claim as a matter of law.

With respect to their *Monell* policies and/or customs claims, Plaintiffs have failed to produce competent evidence that LCCYA has a policy and/or custom of "ignoring the rights" of relatives or guardians who stand *in loco parentis* or "fail[ing] to exercise reasonable care in investigating 'kinship care' applications by families."  The record is bereft of evidence that the evaluation of Plaintiffs' kinship applications reflected standard practice at LCCYA.  Plaintiffs have not cited any other instance where LCCYA failed to search for and engage with kin in other dependency cases.  In fact, at the time that S.P.L. and D.M.L. came into the County's custody, the Agency maintained a written Family Finding policy that directly contravenes Plaintiffs' theory of *Monell* liability. *See* LCCYA Family Finding Policy, Ex. 42; *see also* relevant portions of the deposition transcript of Betsy Frame, Director of LCCYA Permanency Services, Ex. 43, at 20:2-22:2 (describing LCCYA policies to engage in concurrent planning and family finding in

every case). The very existence of this policy demonstrates anything but deliberate indifference toward potential kinship caregivers' rights. For these reasons, summary judgment for the County Defendants is appropriate as to Count III of the Amended Complaint.

**VI.**     **CONCLUSION**

For the foregoing reasons, the Court should grant the County Defendants' motion for summary judgment in its entirety, and enter the Order attached to this motion.

Respectfully submitted,

**MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN**

By: _____
JOHN P. GONZALES, ESQUIRE
Attorney ID No. 71265
MONICA L. SIMMONS, ESQUIRE
Attorney ID No. 323605
2000 Market Street, Suite 2300
Philadelphia, PA  19103
P: (215) 575-2871/2658; F: (215) 575-2871
E-mail:  jpgonzales@mdwcg.com
        mlsimmons@mdwcg.com
*Counsel for the County Defendants*

Date: December 9, 2019